## Case No. 347.

### The ANASTASIA.

### [1 Ben. 188.][1]

District Court, E. D. New York. June, 1867.

BOTTOMRY—CHARTERED VESSEL—PRIOR ADVANCE REPAID OUT OF FREIGHT IN PREFERENCE TO SUBSEQUENT BOTTOMRY — UNIFORMITY IN MARITIME DECISIONS DESIRABLE.

1. The Italian brig Anastasia was chartered in Marseilles to the libellant for a voyage to New York for the round sum of £600. The charter-party provided that the master should sign bills of lading without prejudice to it, the loss or profit arising on them to be for account of the charterer; that the ship should be consigned to the charterer's correspondents, and that the charterer should "advance to the captain in Marseilles 4,000 francs on account of the freight, without interest or commissions, the captain paying the premium of insurance." The charterer advanced the 4,000 francs, and the vessel sailed with a cargo, partly the charterer's and partly taken on board by his orders. The freight by the bills of lading amounted to $3,163.89, in gold, being $283.89 in excess of the charter money. The vessel on the voyage met with disaster, and her captain took up money for her by bottomry on ship, cargo, and freight, and completed his voyage. The bot-

[1][Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

tomry not being paid, the bondholder filed his libel against ship, freight, and cargo, and the consignees paid the freight into court, and gave bonds for the value of the cargo, which abundantly secured the bond. Thereupon, the charterer filed a libel against the freight, claiming the amount of his advance and the excess above the charter money. By consent, his libel was treated as a petition, and the libel of the bondholder as an answer to it.

2. *Held*, That, under the rules which are applied in favor of bottomry bonds as against prior bottomries, mortgages, and other loans to the master or owner, it should be held that a bottomry bond binds not only the ship but her whole earnings. But that a distinction is made in the cases, between advances on freight and other advances, and it is held that sums advanced upon account of the freight must be deducted in preference to the bottomry.

[Cited in The Eureka, Case No. 4,547.]

3. That in this case the freight was, so far as the ship owner was concerned, paid to the extent of the advance, and was not at risk.

4. That the power to hypothecate by bottomry the cargo as well as the ship, is one conferred by the maritime law to facilitate commerce; and that it will be in furtherance of that object to limit the power as to the freight to the interest of the ship owner in the freight. This will enable a charterer to make an advance without risk of losing his security by a subsequent bottomry, which in many cases will enable a ship to raise money without bottomry, and will work no injustice to shippers of cargo, who, shipping in a chartered ship, may be held to have assented to the terms of the charter which provides for the advance.

5. That the interests of commerce require uniformity in the maritime law, as administered in the maritime courts of all countries.

In admiralty. In June, 1867, the Italian brig Anastasia, being in the port of Marseilles, was chartered to one Alfred Giraud, for a voyage thence to the port of New York. The charter-party, among other things, provided that the ship should receive its full and entire cargo at the choice of the charterer; that she should not be laden with merchandise other than that of the charterer or that sent by his order; and that she should sail to New York direct, and there make delivery of the cargo in conformity with the bills of lading, on payment of the freight of the round sum of £600, being for the entire capacity of the vessel. It was also further provided by the charter-party that the master should sign the bills of lading for the freight therein specified, without prejudice to the charter-party, the loss or profit arising thereupon to be for the account of the charterer; that the master should consign his vessel to the correspondents of the charterer in New York, and the charterer should "advance to the captain in Marseilles 4,000 francs on account of the freight without interest or commissions, the captain paying the premium of insurance." In pursuance of this contract the charterer advanced the stipulated sum of 4,000 francs, and the vessel set sail, laden with cargo, partly belonging to the charterer, and the balance taken by his orders, the freight list of which amounted to the sum of $3,163.89, in gold, according to the bills of lading executed by

the master in pursuance of the charter-party. During the voyage the vessel met with disaster, and was compelled to put into Bermuda, where the master raised the sum of £2,500, upon bottomry of the ship, freight, and cargo. Departing from Bermuda, the vessel arrived in New York, when the master declined to consign her to the correspondents of the charterer, refused to deliver up the bills of lading, or allow them to collect the freight, and neglected to pay the bottomry bond when due. The holder of the bond thereupon filed his libel in this court against ship, freight, and cargo; whereupon the consignees of the cargo paid into court the freight money according to the bills of lading, and the ship and freight being insufficient to discharge the bottomry bond, they gave security for the value of the cargo, thus abundantly securing payment of the bond. The freight money being thus in the registry, the charterer, Alfred Giraud, filed his libel against it, claiming to be entitled to be paid out of it, in preference to the bondholder, his advance of 4,000 francs, and $283.89, being the excess of the freight list above the £600 for which the ship was chartered, and praying that the court would marshal the assets and direct payment of these sums to him. This libel being treated as a petition, and the libel of the bondholder being by consent taken as an answer thereto, and the master having filed an answer setting forth the facts attending the bottomry for the information of the court, but not claiming to be entitled to receive any part of the fund, the cause came up upon the issue so framed and the facts as alleged in the respective pleadings which were admitted to be true.

C. M. Da Costa, in behalf of the charterer, argued the following points:

1. At the time of the execution of the bond, the brig had received, on account of the freight due her from the charterer, the sum of 4,000 francs. The captain, therefore, could not and did not pledge it to the bondholder. Had no bond been given, the ship owner would, of course, have had to make the deduction; and, in the language of Dr. Lushington, "The bondholder, who stands in the ship owner's place with reference to this freight, must also be subject to the same deduction." The Catherine, Swab. 264. On principle, too, a man cannot pledge what does not belong to him. All that was then due the ship was the charter money, less the advance; with the freight list the master had, by the terms of the charter-party, no concern.

2. The rule is well settled, that a general hypothecation of the freight by the master in a foreign port, will be construed to include all the freight of the whole voyage, whether earned at the time the bond is made or not, provided it has not been paid to the master or owner.

Or, stated in other language: When freight is included in a bottomry bond, any portion of the freight which has been paid anterior to the date of the bond, is not subject to it. 1 Pars. Mar. Law, p. 429; The John, 3 W. Rob. Adm. 170; The Cynthia, 20 Eng. Law & Eq. 625; The Catherine, Swab. 264; The Standard, Id. 267; The Salacia, Holt, Adm. Cas. 322. In this last and latest case, Dr. Lushington reiterates the rule laid down in his former decisions, but adds, that in case the charter-party provides (as it did there) that the advance was to be made for ship's disbursements, it will not be deemed an advance on account of freight, but a loan to the captain, unless the charter authorizes it to be deducted on the settlement of the freight. In the case at bar, this distinction does not apply, for the charter-party in express terms says, that it is an advance on account of the freight or charter money.

3. The theory invoked that the bottomry bond saved the adventure, and that therefore the advance should be subject to it, is not tenable for a moment, because—1. At the date of the bond, the advance had been paid, and was therefore no longer at risk. 2. Besides, a bondholder has nothing to do with what is at risk or not; all he looks to is the property pledged. The theory of general average, cannot be, therefore, and never is, invoked in his favor. What interests, if any, shall contribute in general average, does not concern him, but only the owners of the property pledged, and their underwriters. The Gratitudine, 3. C. Rob. Adm. 264; Bradlie v. Maryland Ins. Co., 12 Pet. [37 U. S.] 378, 405, 406.

4. The English cases cited under points 1 and 2 are directly in point. The fact that in the case at bar, the charterer himself shipped, only a part of the cargo (the rest being shipped by others with his permission, and by his orders), can make no difference in principle. True, we claim the profit to be for our account, but so would the loss have been. The charter-party expressly provided for the profit or loss being for account of the charterer. Had there been a loss, the bondholder could have compelled the charterer to have paid into court the entire charter money, less the advances. Besides, it nowhere appears in the English cases, that the charterers were the sole shippers of the cargo; and the case of The John, ubi supra, arose between the bondholder and an assignee of the charter-party.

5. All the equities are with the libellant; the bondholder is amply secured. The value of the cargo, alone, is fully five times as much as his bond. The court will, therefore, under any circumstances, so marshal the assets as to enforce the libellant's claim against the freight, leaving the bondholder to enforce his out of the ship, balance of freight, and cargo. See the rule as laid down by Dr. Lushington in The Trident, 1 W. Rob. Adm. 29, 35.

6. The libellant, therefore, is entitled to a decree for the amount claimed, with costs.

J. S. Ridgway, for the respondents, presented the following points:

1. The freight pledged to the lender on bottomry, &c., at Bermuda, was the freight expressed in the bills of lading and payable by the consignees of the cargo then on board for the carriage and delivery of said cargo, contradistinguished from the charter money (denominated freight) or hire of the vessel agreed to be paid by charterer to the owner of the vessel.

2. The power of the master, as agent of all concerned, including the charterer of the vessel, as well as the owner thereof and owners of cargo, to so pledge the freight payable for carriage of such cargo, will not be questioned. And in the present case, not only can the general principle be invoked that the master is in that capacity agent of all concerned, including the charterer, but the provision in the charter-party to the effect that the master shall sign bills of lading of cargo shipped, at rates of freight therefor designated by the charterer, is a recognition in express terms of such agency, and sufficient of itself to constitute the master such agent of the charterer, with power to act in his behalf concerning the subject matter.

3. The charterer was owner pro hac vice, and as such entitled to the ship's earnings on the voyage, and had undertaken the risks of safe carriage and delivery of the cargo specified in the bills of lading. The freight stipulated in the bills of lading was at risk, and dependent upon safe delivery of said cargo at the port of destination. No part of the freight stipulated in said bills of lading had been paid in advance, and the fact of the payment of part, or even the whole of the charter money in advance, does not in a case like the present, of a speculative character, create or constitute a valid claim or lien by or on the part of such charterer to be reimbursed out of the said freight the amount advanced by him on account of the charter or hire of the vessel, superior to or in preference to that of a lender on bottomry; for all the freight was at risk, and by means of the loan on bottomry, &c., was preserved to the benefit of the charterer for whose account and risk said voyage was undertaken and prosecuted. Standing in the position of owner for the voyage, such advance by the charterer, being on account of hire of the vessel and to acquire the control thereof for the voyage for speculative purposes, can be no more the ground of any valid claim to reimbursement of that amount to him out of the freight in preference to the claim and lien of a lender on bottomry, &c., than would the payment of a like sum by a purchaser on account of purchase money or the payment by the absolute owner of such amount

to provision the vessel for and dispatch her on the voyage. The freight on cargo on board, from which the party so advancing (whether owner or charterer) is or expects to be reimbursed with profit, is at risk, and on such freight, preserved and secured by means of such loan, the lender on bottomry has the first claim and lien, and it is such freight that is pledged. The Eliza, 3 Hagg. Adm. 87; 2 Park Ins. 881.

4. The cases of The Catherine, Swab. 264; The John, 3 W. Rob. Adm. 170; The Cynthia, 20 Eng. Law & Eq. 625; The Standard, Swab. 267,—cited and relied on by the libellant, do not, nor do either of them, support or warrant the conclusion sought to be deduced therefrom by him, and the principle upon which the decisions in each and all of said cases rest, is entirely consistent and in harmony with the principle contended for on the part of the bottomry bondholder in the present case. The case before the court differs from the cases so cited, and each of them, in the essential particular and distinguishing fact that in the present case the charter was a "speculative charter," and the freight in the registry is the freight on the cargo of a general ship, payable by the several consignees on delivery of such cargo, and of or on account of which freight no part had been paid in advance, while in the cases so cited it does not appear that the charters were speculative charters, or that there was any cargo on board other than cargo belonging to the charterer or assignees of the charterer, in which cases charter money represents freight on, or compensation for carriage of, cargo on board, and payments in advance on account of such charter money, are substantially and in effect payments in advance of freight on cargo so carried.

5. A bottomry bond operates upon property then the subject of risk. In consideration of the maritime interest, the lender assumes the risks of perils of the seas to time of termination of the voyage and against which he may insure. And in case of a total loss of vessel and cargo by perils of the seas and without fault of any party, the bond would be of no force or effect further and would cease to operate, even though by its terms freight was pledged and though notwithstanding such loss, the charterer was indebted to the owner of the vessel for or on account of charter money or hire of the vessel. The amount of such indebtedness could not be reached by admiralty process, and not because of any defect in the remedies provided, but on principle; because a lender on bottomry, &c., cannot take maritime interest and at the same time have a claim on or hold as security property not subject to risk or perils of the seas on such voyage; and also because (as in the present case) the freight pledged is the compensation for the carriage of goods, and is in the cargo; while the charter money or hire of the vessel rests in covenant, and is not in the cargo, except in in-

stances where the charterer, having chartered for the purpose, loads the ship with his own goods on his own account, in which case the charter money represents the cost of carriage of the goods, and is in said cargo, and the lender's claim or lien on same is with such cargo lost or preserved, as the case may be.

6. The equitable principle arising on or having reference to the question of risk and benefit, is applicable in cases of bottomry, &c., none the less than in cases of average; and in charging amount thereof on vessel, freight, or cargo, or on all, as the case may be, courts of admiralty proceed on and apply the equitable principle that property at risk and benefited, shares burthen. The Dowthorpe, 2 W. Rob. Adm. 74, 81, 85. By means of the loan on bottomry, &c., the charterer was enabled to complete the voyage and deliver cargo, without which the entire freight on such cargo, no part having been paid in advance, would have been lost to him. In the present case the freight and vessel are insufficient to satisfy bond, and resort is then had to cargo, the value of which is over five times the amount of the bond. The lien exists as against all, but as between parties representing vessel, freight, and cargo, respectively, the burthen which was incurred to enable the vessel to proceed and complete her voyage, falls first on freight and vessel, before resort to the cargo for contribution can be had or will be enforced by the court. The carrier having undertaken to transport and deliver cargo safely at the port of destination. the perils are his, to extent of the vessel and freight at risk. And the expenses incident to the fulfillment of such obligation are a charge thereon, and his means to that extent are to be exhausted in defraying it before resort to cargo is had. To give effect to the claim of the petitioner in the present case, and follow out the theory upon which such claim is sought to be sustained, would in effect reserve for charterer's use, from the earnings on said voyage, the sum claimed by him, free from any lien, claim, or contribution, and in preference even to the claim and lien of a bottomry bondholder for the loan made to save from loss the very money so reserved; would relieve charterer pro tanto from risks, hazards, and contingencies incident to the business of carriage of merchandise; and, as between charterer, and owner of cargo, cast upon the cargo such hazard and payment of such additional sum, while yet there remained in the charterer's hands a portion of the freight money paid by consignees for the carriage of said cargo, and not applied by charterer to liquidation of such claim and lien.

7. The motion should therefore be denied, and libel dismissed.

BENEDICT, District Judge. My first impression was adverse to the claim of the charterer, as presented in this case, and I do not now see how the claim can be sus-

tained under the rules which are applied in favor of bottomry bonds as against prior bottomries, mortgages, and other loans to the master or owner. According to those rules it would seem that it should be held that a bottomry bond binds not only the ship but the entire earnings of the ship upon the voyage which is completed by means of the bottomry, in whosesoever hands they may be found.

But I find in the cases a distinction made between advances on freight, and other advances, and that it is held that any sums advanced upon account of the freight must be deducted in preference to the bottomry. In the English cases the distinction has been carried so far as to allow the deduction of a sum advanced by a charterer after the execution of a bond upon the whole freight, where the advance was made with knowledge of the bottomry, but in pursuance of a prior stipulation in the charter-party. The Salacia. 1 Holt, Adm. Cas. 322; less fully reported in 1 Lush. 578.

The language of Dr. Lushington in the case above cited, seems fully to cover this case, when he says, "can the master or the owner of the ship, by any act of theirs (alluding to bottomry,) without the knowledge or consent of the charterer, cancel or alter the terms of the charter, and especially in a case like this, deprive the charter of a security for advances he has bound himself to make? I think not."[2]

According to the charter-party now under consideration, there was a clear prior agreement for an advance of freight upon the security of the money to be earned by the ship upon the voyage in question, and I do not see that the character of this agreement is at all changed by the provisions relative to the bills of lading, which are inserted to make the security effective; for although, so far as the charterer is concerned, the freight money named in the bills of lading may be said to be in the cargo and at risk till the termination of the voyage, yet so far as the ship owner is concerned the freight was paid to the extent of the advance. and was not at risk. It was paid by the charterer upon account, and upon the faith of being allowed to deduct it from any sum the ship might earn during the voyage.

This sum, being thus appropriated by the master in consideration of the advance, cannot, according to the case of The Salacia, be considered as thereafter within the control of the ship owner or his agent, the master. and so is not affected by the bottomry executed subsequently upon the ship's freight. "The bondholder stands in place of the ship owner with reference to the freight, and must also be subject to the same distinctions." The Catherine, Swab. 264.

If these principles thus laid down in the

---

[2] See, also, the case of The Karnak, 18 Law T. (N. S.) 661.

English admiralty are to be applied in this case, it follows that this charterer must be allowed, out of the freight in court, the amount which he claims.

Some general considerations affecting contracts of the description here involved, which are becoming frequent in modern commerce, have led me, not without hesitation, to apply to them the principle applied by Dr. Lushington, in the case of the Salacia, and they may properly be mentioned here.

The power to hypothecate by bottomry not only the ship of the owner, but the cargo of strangers, is one derived from no absolute necessity, but is conferred by the maritime law in order to facilitate commerce and to enable the ship to mitigate in some degree the effects of those disasters which are attendant upon maritime adventures. It will be in furtherance of the same object to limit this power to the interest of the ship owner in the ship's freight, and the interest of the owners of the cargo in the property on board, inasmuch as, without in any considerable degree affecting the ability of the master to relieve his vessel in case of distress, the limitation above indicated will enable a charterer to make advances to the ship owner upon the security of the freight to be paid upon cargo, whether shipped by him or procured by him to be shipped, without risk of losing the benefit of his security by subsequent bottomry effected by a master whom he does not select and cannot control.

Thus the ship owner will in many cases be enabled to procure employment for his ship, which he could not otherwise obtain, and at the same time an advance for the expenses of the outfit at ordinary interest or without interest, and will thus often avoid resort to bottomry, itself always no inconsiderable disaster. Nor will this limitation work injustice to the cargo on board, for, dealing as the sub-shippers do in a case like the present, with the charterer instead of the ship owner or master as to the rate of freight, and shipping by permission of the charterer and for his security and reimbursement, they in fact ship under the charter-party, are put upon inquiry as to its terms, and may justly be presumed to know the extent of their risk and to provide against it.

But if it be said that on general principles the owners of the cargo are entitled to have the value of the vessel and her freight applied to the expenses of the voyage before resort can be had to their property, it may also be said that they are not entitled to have double freight thus applied, and that by shipping in a chartered ship they may well be held to have assented to the terms of the charter, which, by providing for an advance on acount of the freight, has withdrawn so much from the ship owner's risk, and to the same extent increased their own; nor can it with much justice be insisted that

the rules applied to advances made upon bottomry security should be applied to advances of freight, made as part of a charter and upon the security of the ship's earnings, for the advance of the charterer is not made upon the credit of the ship or of the cargo, but of the freight alone, his interest in the freight over and above the advance is seldom large,—in the present case but $282,—and often nothing, and it is not permitted to him to exact the maritime interest which is allowed to a bondholder to compensate for the risk of a subsequent bottomry. And here it may be remarked that if the amount of the freight list in this case had amounted to a less sum than the £600, which the ship earned under the charter, as might very well be the case, the bondholder might have with great plausibility insisted that the fund bound by the bond was the charter money payable under the charter-party to the owner, and not the freight which the charterer was to have and collect for his security.

Such considerations as these, and the other important one that the interests of commerce require uniformity in the maritime law as administered in maritime courts of all countries, especially in regard to contracts by way of bottomry and charter, are always deemed of weight, if, indeed, not controlling in a court of admiralty, (see remarks of Dr. Lushington in The Olivier, 1 Lush. 492,) and they have in this case induced me to uphold the present claim as resting upon a distinction laid down in the English admiralty. I do so, however, not without hesitation, and in the hope and expectation that the soundness of the distinction as well as the correctness of my application of it may be tested by an appeal.

In accordance with these views, let a decree be entered in favor of the petitioner, with costs.

NOTE, [from original report.] On appeal to the circuit court this decree was affirmed as to the amount of the advances, and reversed as to the excess of the freight above the charter money.

[NOTE. Decree of circuit court nowhere reported; opinion not now accessible.]